FILED

2009 Nov-30  PM 05:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **STEPHENS TAYLOR, M.D., and** | ) | |
| **LOUISA TAYLOR,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE HEALTH CARE** | ) | **Case No.:  5:05-CV-2137-VEH** |
| **AUTHORITY OF THE CITY OF** | ) | |
| **HUNTSVILLE d/b/a HUNTSVILLE** | ) | |
| **HOSPITAL, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

---

## MEMORANDUM OPINION

This matter comes before the court on Defendants' Motion for Partial Summary Judgment ("motion"; "the motion") on the following counts of the Complaint: Counts 1, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19 of Plaintiffs' Complaint (# 42).[1] That said, the Defendants say in the motion that only Counts 2 and 3 would survive the granting of the motion.  As noted, Counts 2 and 3 were dismissed after the filing

---

[1] Counts 2 & 3 (ADA and Rehabilitation Act, respectively) were dismissed with prejudice on April 6, 2007, in response to the Plaintiffs' Motion to Dismiss filed April 3, 2007.  (#76, 77). Counts 4 & 5 (Sherman / Clayton Antitrust and Alabama Antitrust, respectively) were dismissed with prejudice on April 11, 2006, in response to the Plaintiffs' Motion to Dismiss filed April 10, 2006.  (# 53, #54).

of the Motion.  Further, all claims of Plaintiff, Vascular Surgery Center of Huntsville, P.C., have been dismissed by prior Order.  Stephens and Louisa Taylor are now divorced.  In any event, the motion has been fully briefed and under submission for some time.  For the reasons given, the Defendants' Motion for Partial Summary Judgment is due to be **GRANTED** as to all remaining counts against all Defendants.

## I. <u>Introduction</u>

This multiple-defendant action is before the court on the Plaintiffs' Amended Complaint (#59).  After prior orders dismissing Counts 2, 3, 4, and 5, the following counts asserted in the Complaint remain:

Count 1 - Free Speech, Due Process, Equal Protection

Count 6 - Breach of Contract

Count 7 - Judicial Review of Fairness in Peer Review

Count 8 - Business Disparagement; Slander; Libel

Count 9 - Tortious Interference with Contract / Business Relationship

Count 10 -  Tortious Interference with Prospective Advantage

Count 11 - False Light & Invasion of Privacy

Count 12 - Violation of HIPAA

Count 13 - Breach of Physician & Therapist Privilege

Count 14 - Outrage

Count 15 - Application for Permanent Injunction

Count 16 - Declaratory Relief - Compliance with Bylaws, Rescission, and Expungement

Count 17 -  Declaratory Relief - HCQIA Immunity

Count 18 - Loss of Consortium

Count 19 - Civil Conspiracy

## II.  <u>Parties & Claims</u>

Defendants submitted a number of Exhibits in support of the motion.  Dr. Taylor's primary opposing facts are contained in two Declarations of Dr. Taylor, ("SEALED #56-4 & 5").

The primary Plaintiff, Stephens Taylor, M.D., filed this action as a result of Defendants' precautionary suspension and final termination of Dr. Taylor's privileges at Defendant Huntsville Hospital ("Hospital").[2]  Both the precautionary suspension and final termination were conducted through the peer review process that is

---

[2]Defendant Huntsville Hospital is a Health Care Authority organized pursuant to the Health Care Authorities Act of 1982.  (Affidavit of Faith E. Rhoades, ¶ 13).  The Hospital is governed by a Board of Directors (the "Board"), which employs an administrative staff led by the Chief Executive Officer responsible for the operation of the facility.  (HH 6; HH 3935; Rhoades Affidavit, ¶ 2).  The Vice President and Chief Medical Officer (the "CMO"), is a physician, and a paid administrator of the Hospital, and, in 2003, Dr. Robert Chappell, a Defendant, was the CMO.  (HH 2508-2509).  The Medical Staff is composed of all the physicians with privileges to practice at the Hospital, is organized under the authority of the Board, with an office of President, a position which Defendant Dr. Michael Brown held in 2003.  (HH 6-106; HH 18; HH 2431-32).

structured and governed according to the bylaws of the Hospital.  For the sake of brevity, the court will refer to the "precautionary suspension" as the "suspension" and Dr. Taylor's final "termination" as the "termination".

Plaintiff Louisa Taylor was the wife of Dr. Taylor at the time the Complaint was filed.  They are now divorced.  Individually, she asserts a claim of loss of consortium; however, in classic shotgun pleading fashion she also asserts every additional claim contained in the Complaint.  However, the only claims which Mrs. Taylor could assert under the facts of this case are contained in Counts 11 (False Light & Invasion of Privacy) and 14 (Outrage).  That said, the facts of this case do not support a loss of consortium claim by Mrs. Taylor.  There are no allegations of fact, much less any evidence, that Dr. Taylor suffered a physical injury as a result of Defendants' actions.  Alabama law mandates that recovery under a loss of consortium claim "is premised on a physical injury suffered by the spouse."[3]  *Slovensky v. Birmingham News Co.*, 358 So. 2d 474, 477 (Ala. Civ. App. 1978) (citing *Swartz v. United States Steel Corp.*, 304 So. 2d 881 (Ala. 1974)).  As such, Mrs. Taylor's loss of consortium claim is due to be **DISMISSED** without further discussion.

---

[3] It is worthy of note that an action "revolv[ing] around a breach of an employment contract by a wrongful dismissal of [a] plaintiff's husband . . . will not support a claim of consortium due to the absence of a physical injury."  *Slovensky v. Birmingham News Corp.*, 358 So. 2d 474, 477 (Ala. Civ. App. 1978).

The following claims remain against all Defendants: (1) violation of free speech, due process, equal protection, and other rights pursuant to 42 U.S.C. § 1983 (Count 1); (2) business disparagement, slander, and libel (Count 8); (3) tortious interference with an existing business (Count 9); (4) tortious interference with "prospective advantage" (Count 10); (5) false light and invasion of privacy (Count 11); (6) violation of patient confidentiality and HIPAA (Count 12); (7) breach of physician and psychotherapist confidentiality (Count 13); (8) outrage (Count 14); (9) request for declaratory relief (Counts 16, 17); and (10) civil conspiracy (Count 19). The following claims remain against the Hospital alone: (1) breach of contract (Count 6); (2) judicial review of fairness in peer review (Count 7); and (3) application for permanent injunction against the Hospital (Count 15).

### III. <u>Facts</u>

In their briefs, both Plaintiffs and Defendants directed the court to a wide array of facts which are immaterial to the claims or defenses in this case. A material fact, where disputed, shall be noted as such. The court has construed all reasonable doubts about the facts and drawn all justifiable inferences from the facts, in the light most favorable to the Plaintiffs; however, the court has not devoted discussion to disputed or undisputed "facts" which are not material. As discussed *infra*, the substantive law determines which facts are material in a case.

5

"Peer review" is the process by which physicians and hospitals evaluate and discipline staff doctors.  It is undisputed in this case that the suspension and the termination of Dr. Taylor's privileges at the Hospital were made pursuant to the peer review process.  While Plaintiffs allege that there is a great dispute behind the personal motives of the individuals who served on the peer review bodies that are the focus of this litigation, the evidence clearly establishes that both the suspension and the termination are amply supported by Dr. Taylor's performing procedures, the last one being a carotid stent insert, which he was not privileged to perform, and based on a history of Dr. Taylor's well-documented instances of roughly twenty reported and investigated prior complaints of his "behavioral problems" at the hospital. Between 1987 and 2003, Dr. Taylor was the subject of more than twenty behavioral or patient care reports for unprofessional behavior.  (HH 3644-3668; HH 3669-3690). Dr. Taylor was subject to disciplinary action as a result of these reports.  These reports formed the basis, in part, for his suspension as well as the final decision to terminate Dr. Taylor's privileges at the Hospital.  Plaintiffs indicate a desire for this court to individually note and examine for fairness or error each of the complaints of Dr. Taylor's "behavioral problems."  The court declines to do so.  The manner in which these complaints were handled by Dr. Taylor and/or by the Defendants is not dispositive to Dr. Taylor's claims, the defenses asserted, or the relevant facts.

6

Accordingly, the court will not delve into a discussion of these complaints beyond that above, noting that the "behavioral" complaints formed part of the basis for the actions of the peer review bodies.

"Privileges" means the rights that a physician has to provide medical care and perform procedures at the Hospital.  (2514-2529; 2018-20).  Mere admission to the Medical Staff does not give a physician the right to perform any procedure at the Hospital; instead, each physician must obtain privileges. (2018-21; 2515).  However, according to the Hospital's Bylaws, in the case of an emergency involving a patient, a physician may exercise clinical privileges not specifically assigned to him.  (HH 54).  For the purposes of the Bylaws, an "emergency" is defined as a condition which could result in serious or permanent harm to a patient or in which the life of a patient is in immediate danger and any delay in administering treatment would add to the harm or danger.  (HH 54).  Witnesses for the Hospital acknowledged "that in dealing with a medical emergency, certain medical decisions have to be made that technically may not be within the scope of a certain credential."  (HH 2094-95).

Some procedures are part of the core privileges of a physician of a particular specialty, which typically are those procedures the physician should be competent to perform by virtue of his or her residency training. (2520; 1936).  "Special privileges" are necessary to perform procedures that the Medical Staff and Hospital have decided

require additional training in order to be performed at a high level and with high quality, and they are separately credentialed.  (2520-21; 2520-2525; 1918-35). Plaintiffs state that privileges have also been granted on the basis of economic concerns and personal relationships.  (HH 2084-85, 2087-88, ST 12).   The credentialing procedure by which a physician obtains privileges is "fundamental" to the Hospital and Medical Staff, according to Dr. Schreeder,[4] through that process, the Medical Staff and Hospital ensure that "any physician practicing in the hospital has been appropriately trained and is capable of doing the procedures that he is credentialed to do."  (2019).

There are numerous committees on which physicians serve in a voluntary capacity and through which the Medical Staff handles its own governance.  (HH 6-106).  Defendants maintain that five of the standing committees participated in the peer review of Dr. Taylor.  (1625; 1618; 1590; 1589; 1461-62; 1742).  Plaintiffs dispute that the five standing committees operated as independent committees as the leadership of these five committees was virtually the same.  (Plaintiffs' Response Brief, p.1; HH 2365; ST 14).

One such committee, the Wellness Committee, serves in an advisory capacity to other committees and monitors and reviews the medical staff member's physical

---

[4] A named Defendant.

and mental health as it affects medical staff membership and privileges.[5] (88-89). As of March 2001, the members of the Wellness Subcommittee were: Dr. Jane Roark,* Chair, Dr. Alice Chenault, Dr. Stancel Riley, Dr. Sheela K. Parrish, Dr. Sherrie Squyres,* Dr. Chappell.*, Dr. Michael Linder, and Dr. Todd Broome.[6] (Rhoades Affidavit, ¶ 6). Plaintiffs maintain that the makeup of members of the March 2001 Wellness Subcommittee was altered from the makeup of the original Wellness Subcommittee for the purpose of Dr. Taylor's peer review so that Drs. Squyres, Roark, and Chappell were added as members of the Subcommittee. (ST 108).

Another committee, the Surgery Clinical Department Review Committee (the "CDRC") reviews the quality and appropriateness of patient care. (93). Every department has a CDRC; there are ten physicians on the Surgery CDRC. (93). In 2003, the members were: Dr. Joe Clark, Dr. William Alison, Jr., Dr. Robert L. Hash, Dr. Deepak Katyal, Dr. Ken Teachey, Dr. Fred Stucky,* Dr. Evan Cohen, Dr. Neeta Kohli-Dang, Dr. Joseph Hicks, and Dr. Raymond Sheppard, Jr. (Rhoades Affidavit,

---

[5] Plaintiffs contend that the Wellness Subcommittee established to monitor Dr. Taylor was never used for "assistance and rehabilitation" as suggested by the Joint Council on Accreditation of Healthcare Organizations ("JCAHO") or to serve the stated function of "review[ing] and monitor[ing] the medical staff member's physical and/or mental health." (ST 41; HH 88) Instead, Plaintiffs assert that the Subcommittee was used as a perpetual peer review of Dr. Taylor and as an instrument of psychological intimidation. (HH 1504-05, 1508, 1511, 1513-69, 1652-57; ST 41).

[6] The members of the different committees who are named as defendants are marked with an asterisk.

¶ 7).

The Credentials Committee, which also participated in Dr. Taylor's peer review, is a standing committee that coordinates the credentialing and delineation of privileges of the Medical Staff.  (87).  In 2003, nine physicians served on the Credentials Committee: Dr. Marshall Schreeder, Chair,* Dr. Sherrie Squyres,* Dr. R. Macon Phillips,* Dr. Joel Pickett, Dr. Michael Powell, Dr. David Bramm, Dr. Greg Merijanian, Dr. William Nuessle, Dr. Frank Honkanen.  **(**Rhoades Affidavit, ¶ 8**)**. The Medical Staff at the Hospital delineates the privileges and sets up credentialing locally.  (2050; 2515).

The Endovascular Committee also participated in the peer review of Dr. Taylor. (1590).  The Endovascular Committee formulates uniform criteria for obtaining privileges to perform procedures, like arteriograms and angioplasty, that cross specialty lines. (2007; 2515-19; 2327-29).  Dr. Schreeder explained that because "the credentialing issue becomes more difficult when you have multiple specialties involved; where you have, for instance, an area where procedures are performed by physicians who are trained with multiple backgrounds," the Endovascular Committee was created to create uniform credentialing standards. (2006-2007).  The Medical Staff put in a "tremendous" amount of work to develop these uniform standards. (2008).

10

Dr. Taylor had input into the development of Interdepartmental Credentialing Standards for Endovascular Procedures and was familiar with the standards. (2668-2670). Dr. Taylor's input was given as part of the collective input of all vascular surgeons at the Hospital. (ST 110-11).

The Interdepartmental Credentialing Standards for Endovascular Procedures govern credentialing for endovascular procedures. (2416; 2334-35; 1918-35). After those standards were enacted by the Board, the same committee monitors those standards. (2007; 2327-29). The Endovascular Committee had, as standing members, physicians from each of the specialities that typically perform some of the same procedures-- vascular surgery, radiology, and cardiology. (2007; 2327-28). The founding chair of the committee, Dr. Macon Phillips,* did not practice in those fields. (2328; 2074). In addition, a cardiologist was not on the Endovascular Committee at the time of Dr. Taylor's peer review. (ST 18).

In 2003, there were five total members of the Endovascular Committee: Dr. N. Sherrie Squyres, Chair,* Dr. Alex Johnson,* Dr. Fred Stucky,* Dr. Tejanand Mulpur, and Dr. Robert Platt. (Rhoades Affidavit, ¶ 9). Plaintiffs assert that, while these individuals may have been on the standing committee, the makeup of the committee was intentionally altered for Dr. Taylor's peer review to include members who were already hostile to him (Squyres, Phillips, Schreeder, Chappell, Stucky, Johnson).

(HH 001937; ST 17).  *See* fnote 7, *infra*.

The Medical Executive Committee (the "MEC") ensures that the Medical Staff provides quality medical care and recommends to the Board corrective actions based on investigations of physician misconduct or incompetent patient care.  It participated in Dr. Taylor's peer review.  (86; 1589; 1461-62).  The MEC is a representative body with thirteen members, made up of Medical Staff officers and the chairs of each of the departments. (27).  In 2003, the Medical Staff Officers were: Dr. Michael W. Brown,* President, Dr. Todd A. Broome,* Vice President, and Dr. Claude L. Kinzer, Secretary.  **(**Rhoades Affidavit, ¶ 10**)**.  The department chair members were: Greg V. Merijanian, Chair Department of Anesthesiology, Dr. Helen Robinson, Chair Department of Emergency Medicine, Dr. F. Stephen Herrington, Chair Department of Family Practice, Dr. James M. Smelser, Chair Department of Medicine, Dr. Gregg Delisle, Chair Department of Obstetrics-Gynecology,[7] Dr. Ray J. Moore, III, Chair Department of Pathology, Dr. Michael E. Klemm, Chair Department of Pediatrics, Dr.

---

[7] Dr. Randy Light, Vice-Chair Department of Obstetrics-Gynecology, attended the meetings of October 28, 2003, and November 11, 2003, in the place of the Chair of his department, Dr. Delisle, who could not attend.   (Rhoades Affidavit, ¶ 12).

Scariya M. Kumaramangalam, Chair Department of Psychiatry, Dr. Richard J. Coleman, Chair Department of Radiology, and Dr. Peter A. Vevon, Chair Department of Surgery. **(**Rhoades Affidavit, ¶ 11**)**.

As to Dr. Taylor's peer review, the MEC conducted no investigation of its own and simply adopted the findings of the Endovascular Committee and Credentials Committee. (HH 1467, 1945, 2904). The various witnesses that testified on behalf of the Hospital before the Hearing Panel confirmed that the Endovascular Committee was the committee upon whose alleged expertise the Hospital relied in rendering an opinion about Dr. Taylor's medical judgment to use the carotid stent. (HH 2006, 2060, 2099, 2462, 2503-04).

While the peer review committees play an important role, the Board has the authority to accept or reject any recommendation and makes the final decision over revocation of privileges. (38; 3935). The Board and Hospital are required to act in compliance with their Corporate Bylaws, Medical Staff Bylaws, and principles of fundamental fairness and due process. (HH 1-118; ST 36, 144).[8]

<u>The Surgery Leading To Dr. Taylor's Suspension and Termination</u>

_____

[8] Dr. Taylor attacks the Board's and Hospital's adoption of the recommendation for his termination as a rubber stamp or sham. That said, before his meeting with the MEC that preceded his suspension, Dr. Taylor received the notebook of documents of his past behavioral problems that was in front of the MEC. (2662).

On May 15, 2003, Dr. Taylor operated on a 53 year old female patient to remove blockage in the left internal carotid artery; that artery is located in the neck and leads to the brain.  (1625; 2133-34; 2608; 2617).  Dr. Taylor's pre-surgical description of the surgery to the Hospital was that he would perform an arch aortogram, left subclavian angiogram, and left carotid endarterectomy, all of which Dr. Taylor had privileges to perform.   (1626; 2517-19).

The left carotid endarterectomy required the surgical opening of the patient's neck to access the carotid artery so that the surgeon could remove from the wall of the artery plaque that is blocking the flow of blood.  (2119-20; 2124; 2219; 2612; 2621).

Both before and during the surgery, Dr. Taylor performed two different surgical procedures, neither of which he had been granted hospital privileges to perform.  (1580-81; 1938-39; 1461-63; 2009-10; 1619; 2604; 2622; 2627; 2638; 2668).

First, he performed two selective carotid arteriograms; a selective carotid arteriogram is a medical imaging technique that visualizes the flow of blood through the artery.  (283; 1580-81; 2676-77; 1918).  The technique involves inserting a catheter into an artery so that a contrast agent can be injected into the blood, allowing the physician to see the patient's blood flow. (283; 1918-19).  The reason the

arteriograms were unauthorized is because they were "selective," which means the surgeon, here Dr. Taylor, did not insert the catheter into the carotid artery itself. Dr. Taylor had privileges to perform direct arteriograms, *i.e.*, the insertion of catheters directly into the carotid artery itself. With this patient, Dr. Taylor instead inserted the catheter through the femoral artery in the upper thigh, and then took the catheter through the aorta to the carotid artery. (2517; 2519; 2063; 1918).

Dr. Taylor performed the selective carotid arteriogram before beginning the left carotid endarterectomy. (1581-83; 2009-10; 2676-83). He performed the second selective carotid arteriogram after he completed the left carotid endarterectomy. (1581-82; 2676-84; 2613-18).

When the second selective carotid arteriogram revealed continued blockage of the carotid artery, Dr. Taylor placed a stent in the artery. (2613-18). Carotid stenting does not require the physician to open the neck, but instead uses balloon angioplasty to open the carotid artery and the stent to keep it open. (1919; 2621). Such stenting is an alternative to endarterectomy. At the time, 2003, the Hospital, through its Credentials Committee and Endovascular Committee still considered carotid stenting as a controversial procedure. (1581; 2332; 1919; 2612), and no physician at the

Hospital had privileges to perform carotid stenting.[9]

Shortly after the surgery, Dr. Taylor told Dr. Chappell that he had just placed a stent in the carotid artery of a patient, that he knew that his performing the stenting was something he was not privileged to perform and that his having done so would become an issue with the Credentials Committee.  Dr. Taylor told Dr. Chappell that his patient was doing fine.  (1946; 1619; 2544-46).  Subsequently, the patient who received the selective carotid arteriograms and carotid stent died without recovering from the surgery.  (1625).

## Additional Undisputed Facts

The court accepts as proven by the Defendants, and not materially disputed by Dr. Taylor, the following facts, summarized in the Defendants' Reply at pages 36 - 38:

a. Dr. Taylor had a long history of acting unprofessionally and inappropriately, dating back to his first days on the Medical Staff in 1987.

b. By 2001, Dr. Taylor admits "he had reached a personal and professional crisis."  Dr. Taylor yelled at the operating room supervisor in January of 2001, resulting in a "final warning".[10]

---

[9] Except under the auspices of investigational procedures, which is governed by the Institutional Review Board, which is not claimed to have been the protocol used with this patient. (1619; 2021-23; 2332).

[10] It is undisputed in the record that Dr. Taylor received more than one "final" warning before his suspension and termination.

16

c.     The MEC required Dr. Taylor to obtain psychiatric evaluation, among other things.  Dr. Taylor says he benefitted from his stay at the Menninger Program and from his continued treatment.

d.     According to Dr. Taylor, the complaints about his behavior "diminished" after his stay at Menninger.  Nevertheless, he continued to have problems and in 2002, he received another final warning.

e.     In May of 2003, Dr. Taylor performed two unprivileged procedures. One of those procedures, carotid stenting, was considered so controversial that no physician at the Hospital was privileged to perform it, except under very limited and controlled circumstances.  Dr. Taylor had never performed one outside a training context.   The other procedure, selective carotid arteriogram, Dr. Taylor testified that he had never performed at the Hospital until he returned from a conference in Cincinnati a few months before hand, and, when he got back, that he did not even attempted to check to see if he had the necessary privileges.

f.     Dr. Chappell, the Chief Medical Officer, referred Dr. Taylor's actions to the Surgery CDRC, triggering what become the final peer review of Dr. Taylor.

g.     The peer review was exhaustive.  In all, four different committees (the CDRC, Endovascular Committee, Credentials Committee, and MEC) with 38 physicians reviewed Dr. Taylor's conduct, and all 38 physicians agreed that Dr. Taylor performed unprivileged procedures.  Dr. Taylor was given a chance to personally convince three of the committees (Endovascular Committee, Credentials Committee, and the MEC) that he did not do anything wrong.  All 28 physicians serving on those three committees rejected Dr. Taylor's assertions.

h.     Dr. Taylor had yet another chance to convince three additional physicians that he did nothing wrong and should not be terminated from the Medical Staff.  After a four day hearing, Dr. Don Evans and Dr. Ben Washburn, who are not defendants, and Dr. Bob Winn unanimously agreed that Dr. Taylor performed two unprivileged procedures, and that the recommendation that his privileges be terminated was reasonable

17

and just.

i.      Four more officials of the Hospital, Philip Bentley, Jr., Russell Brown, Dr. William Shasteen, and Jean Templeton–not one of whom is a defendant–did not find Dr. Taylor's actions, or his defense thereof, persuasive.

j.      All told, forty-five (45) physicians and other Hospital Board officials over a sixteen (16) month period either supported or reached the same conclusion, adopted or taken by the full Board unanimously, which was that Dr. Taylor's privileges at the Hospital should be terminated.

## IV.   <u>Standard of Review</u>

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for

18

trial.  *Celotex*, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant.  *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248;  *Chapman*, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (*citing U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative

evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the non-moving party's case.  *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged

evidentiary deficiency.  However, when responding, the non-movant can no longer

rest on mere allegations, but must set forth evidence of specific facts.  *Lewis v. Casey*,

518 U.S. 343 (1996) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

(1992)).

## V.  **Discussion**

### A.    **Health Care Quality Improvement Act ("HCQIA") Immunity**

In cases in which HCQIA immunity is claimed, the statutory presumption in

42 U.S.C. §11112(a) creates an unusual summary judgment standard.  In *Bryan v.*

*James E. Holmes Regional Medical Center*, 33 F.3d 1318 (11th Cir. 1994), the

Eleventh Circuit said, in determining whether summary judgment should be granted

as to HCQIA immunity, the court, asks "might a reasonable jury, viewing the facts

in the best light for the plaintiff, conclude that the plaintiff has shown, by a

preponderance of the evidence, that the defendants' actions are outside of the scope

of §11112(a)?" 33 F.3d at 1332.  In other words, the inquiry focuses on "whether [the

plaintiff] provided sufficient evidence to permit a jury to find that he ha[d] overcome

... the presumption that [defendants] would reasonably have believed" they met the

HCQIA requirements.  *Id*.  A plaintiff need only rebut this presumption by a

preponderance of the evidence.  *Id.*

HCQIA immunity is a question of law for the court to decide and may be

resolved whenever the record in a particular case becomes sufficiently developed. *See Bryan* at 1332.  Courts typically resolve the issue of HCQIA immunity at the summary judgment stage, but if summary judgment standards cannot be satisfied, resolution of that issue may be deferred until or after trial.  *Id*.

Defendants contend that HCQIA immunity bars all of Plaintiffs' claims for damages except those claims in Counts 1 and 3.[11]  Defendants further argue that the physicians who participated in the peer review are protected by HCQIA in that the physicians were either members or under contract with a "professional review body"

The term "professional review body" is defined as "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity".  42 U.S.C. § 11151(11).  Defendants assert that the Hospital also falls within the category of a "professional review body."  Therefore, Defendants maintain that the Hospital is presumptively entitled to the immunity from monetary liability under § 11111(a) of HCQIA.

Before determining whether the procedural standards for proper peer review

---

[11] Count 3 was dismissed, with prejudice, after Defendants' Motion for Summary Judgment was filed.

proceedings are satisfied in this case, the court must first address Plaintiffs' arguments that the events and entities at issue fit within the definitions of HCQIA's operative terms.  The disciplinary actions at issue here are: (1) the decision by the MEC on October 14, 2003, to place Dr. Taylor on suspension; and (2) the final decision of the Board to terminate Dr. Taylor's privileges.

The term "professional review action" is defined in HCQIA as follows:

> [A]n action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges ... of the physician.

42 U.S.C. § 11151(9).

Plaintiffs point out that the terms "professional review action" and "professional review activity" are, in at least one instance, seemingly used interchangeably in Defendants' papers.  The interchangeable use of these terms is of no consequence to this opinion.  Both "professional review actions" and "professional review activities" are entitled to HCQIA immunity.  *See Bryan*, 33 F.3d at 1334.  A "professional review activity" is defined in 42 U.S.C. § 11151(10) as:

> [A]n activity of a health care entity with respect to an individual physician-

> (A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,

(B) to determine the scope or conditions of such privileges or membership, or

(C) to change or modify such privileges or membership.

The actions of the Hospital and the individual defendants involved in the suspension and the termination of Dr. Taylor's privileges fall within this definition. The suspension and the revocation of Dr. Taylor's privileges qualify as professional review actions. Pursuant to *Bryan*, the recommendations upon which the suspension and the Board's final decision were based are "within the scope of the relevant conduct" of HCQIA. *See* 33 F.3d at 1334.

A "professional review body" is defined as "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." 42 U.S.C. § 11151(11). Furthermore, the term "health care entity" includes "a hospital that is licensed to provide health care services by the State in which it is located." 42 U.S.C. § 11151(4)(A)(i). The Hospital decision-makers in this case fall within those categories. As a result, the Hospital is entitled to immunity from monetary liability under section 11111(a) of HCQIA if the peer review process met the standards set forth in section 11112(a).

HCQIA provides immunity as long as the peer review action satisfied four

24

criteria:

> For the purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken–
>
> (1)  in the reasonable belief that the action was in the furtherance of quality health care;
> (2)  after a reasonable effort to obtain the facts of the matter;
> (3)  after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and
> (4)  in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirements of paragraph (3).

42 U.S.C. § 11112(a).

Plaintiffs argue that Defendants cannot meet any of these elements in the case at bar.  "[I]f a plaintiff challenging a peer review action proves, by a preponderance of the evidence, [that] any one of the four requirements was not satisfied, the peer review body is no longer afforded immunity from damages under the Health Care Quality Improvement Act."  *Brown v. Presbyterian Healthcare Services*,  101 F.3d 1324, 1333 (10th Cir. 1996).

In this case, there are two peer review actions.  One is the decision by the MEC on October 14, 2003, to place Dr. Taylor on suspension.  The other is the decision by the Board to terminate Dr. Taylor's privileges.  The court will address each peer

review action in tandem.

On October 14, 2003, the MEC placed Dr. Taylor on suspension.  According to the Defendants, and not challenged by the Plaintiffs, the MEC's suspension "came after Dr. Taylor's more than twenty past behavioral and patient care events; after the final warning given to Dr. Taylor by the MEC; after the CDRC concluded that Dr. Taylor performed unprivileged carotid stenting; after the Endovascular Committee concluded, having received input from Dr. Taylor, that Dr. Taylor performed two procedures he was not privileged to perform; after the Credentials Committee met with Dr. Taylor allowing him to explain why he performed both procedures; and after it unanimously concluded that he did not have those privileges, and had a reasonable medical alternative to the stenting." (Brief in Support of Summary Judgment, pp. 33-34).  Later, the Board opted to terminate Dr. Taylor's privileges for these reasons.

Plaintiffs respond to Defendants' assertions that the peer review action was "in the reasonable belief that the action was in the furtherance of quality health care" by arguing that: (1) Defendants were retaliating to Dr. Taylor's "whistle-blowing activities"; and (2) that Defendants' "use of Dr. and Mrs. Taylor's private medical records (including psychotherapy notes) is not reasonable." (Response to Motion for Summary Judgment; pp. 74-76).  Plaintiffs offer a universal response to Defendants' contentions that both the suspension and the termination of Dr. Taylor's privileges

satisfy the first prong of HCQIA immunity.

Plaintiffs and Defendants agree that the court must analyze the peer review actions to determine whether the reviewers, with the information available to them at the time of the review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients.  *See Bryan*, 33 F.3d at 1335.   The court concludes that the record in this case establishes that both the suspension and the termination were reasonable and in the furtherance of quality health care.  Dr. Taylor had an established history of frequently disruptive behavior and sometimes unprofessional conduct dating from shortly after he began his employment with the Hospital in 1987.  Both the suspension and the termination of Dr. Taylor's privileges were imposed as a result of Dr. Taylor's history of behavioral problems as well as his performing procedures for which he was not privileged.

A review of the record makes clear that the decisions to suspend and, later, to terminate Dr. Taylor's privileges were taken "in the reasonable belief that the action was in the furtherance of quality health care." Id. § 11112(a)(1). This prong of the HCQIA immunity test is met if "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Bryan*, 33 F. 3d at 1334-35, citing H.R.Rep. No. 903, at 10, reprinted in 1986 U.S.C.C.A.N.

27

at 6393. The record in this case reveals that the revocation of Dr. Taylor's privileges was prompted by the reasonable belief that doing so would promote quality health care. Dr. Taylor had exhibited a well-documented pattern of unprofessional conduct over a period of many years, and he was given a series of opportunities to remedy his unacceptable conduct.  In addition, it is undisputed that Dr. Taylor performed on a patient procedures for which he was not privileged, that there were alternative procedures Dr. Taylor could have performed that he had privileges to perform, and that the patient died shortly after Dr. Taylor completed the procedures.  Eventually, the Hospital concluded that, because of his behavior and his performance of unprivileged procedures, Dr. Taylor's continued employment was disruptive and interfered with quality patient care. Moreover, the Board was properly concerned about Dr. Taylor's record of inability to abide by the Hospital's rules regarding interaction with other employees and regarding the performing of surgical and diagnostic procedures. Accordingly, the Hospital dealt appropriately with the perceived situation in suspending and terminating Dr. Taylor's privileges.

In response to the instant motion, Dr. Taylor asserts that the members of the professional review bodies were motivated by personal animosity and not by concern for patient care. In *Bryan*, the Eleventh Circuit held that "bad faith is immaterial" to a HCQIA analysis, that the test is objective, and that "[t]he real issue is the

28

sufficiency of the basis for the [Hospital's] actions." *Bryan*, 33 F. 3d at 1335.  Like

the plaintiff in *Bryan*, Dr. Taylor introduced no evidence, however, that such hostility

determined the outcome of the peer review process.   Moreover, Dr. Taylor's

assertions of hostility do not support his position that the Hospital is not entitled to

the HCQIA's protections because they are irrelevant to the reasonableness standards

of § 11112(a).  *Id*.  The court concludes that Dr. Taylor failed to provide sufficient

evidence to permit a jury to find that he had overcome, by a preponderance of the

evidence, the presumption that the Hospital's disciplinary action was taken in the

reasonable belief that it would further quality patient care.[12]

Second, a review of the record reveals that the Hospital took its action "after

a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(2).  By Dr.

Taylor's own words, his conduct and past behavioral problems had been evaluated

by the CDRC (#56-4 at p. 6), the Endovascular Committee (*Id*., at pp. 6 - 7), the

---

[12] Plaintiffs argue that the use of Dr. and Mrs. Taylor's "medical records" during the peer review process was impermissibly egregious and that such use demonstrates that the suspension and termination were not done in the furtherance of quality patient care.  Plaintiffs, however, have not indicated or presented any evidence beyond the pleadings that could reasonably lead one to the conclusion that: (1) the medical records were used during the peer review process; (2) if used during the review process, the use of the medical records was impermissible as a matter of law; or (3) as a matter of law, the use of the medical records is sufficient to bar HCQIA immunity.  The foregoing notwithstanding, the court finds ample evidence that, regardless of whether the Taylors' medical records were used by the peer review bodies, there is sufficient evidence that the suspension and termination were nonetheless imposed in the furtherance of quality health care.  As discussed *supra*, bad faith does not negate HCQIA immunity, and Plaintiffs' assertions on this point are essentially a bad faith argument and do not negate the quality of patient care issues with regard to Dr. Taylor that were relied upon by the Hospital.

Credentials Committee (*Id*. at pp. 8 - 9), and the Wellness Committee (ST 41; HH 88; HH 1504 - 95; 1508, 1511, 1513 - 69, 1652 - 57; ST 41).

The MEC, at a meeting on October 14, 2003, unanimously voted to place Dr. Taylor on precautionary suspension.  (1938).  This suspension took place after Dr. Taylor's actions were reviewed by the CDRC (#56-4 at p. 6) (93; 1590; 1625; 1937), the Endovascular Committee (#56-4 at pp. 6 - 7) (1581; 1618-20; 1624; 2339), and the Credentials Committee (*Id*. at pp. 8 - 9) (1590; 1938; 2011; 2354).  The MEC also had at its October 14, 2003, meeting, a notebook of documents reflecting the past behavioral problems and events involving Dr. Taylor.  (1938; 2437-38).

The MEC did not recommend termination of Dr. Taylor's privileges until after its October 28, 2003, meeting, a meeting attended by and participated in by Dr. Taylor. (1580 - 1584).  Before the October 28, 2003 MEC meeting, Dr. Taylor received the notebook of documents reflecting the past behavioral problems and events involving him.  (2662).  At the October 28, 2003 MEC meeting, Dr. Taylor, referring to the selective carotid arteriograms, said "[C]learly I have not satisfied the criteria pointed out by Dr. Chappell in the credentialing standards for performance of selective carotid arteriograms."  (1463).

Each of the four groups (the CDRC, the Endovascular Committee, the Credentials Committee, and the MEC) submitted reports to the Hospital's Board,

which made its decision based upon the documentary record developed during the various peer review proceedings described above, and after Dr. Taylor had the opportunity to make a presentation. At a November 11, 2003, meeting, acting without dissent, the MED concluded that Dr. Taylor did not have privileges to perform either the selective carotid arteriogram or the carotid stenting, and that Dr. Taylor had acceptable alternatives to stenting, such as to  re-open the patient or seek an intraoperative consultation. (1461-62; 1938-39).  It rejected Dr. Taylor's explanation that he misinterpreted his privileges to include the right to perform selective carotid arteriograms, and noted that "there is a long history of matters with [Dr. Taylor]," and said it was "concerned with the inordinate amount of resources . . . that have been required over the course of Dr. Taylor's practice here, to monitor and assure his cooperative behavior and performance." (1461-62; 1939).  By letter dated that same day, November 11, 2003, the MEC notified Dr. Taylor that the MEC recommended that his privileges be terminated, the reasons for that recommendation, and his right to request a hearing on that recommendation.  Dr. Taylor was given a copy of the relevant portions of the bylaws that explain the hearing and appeals procedures. (1459-60).  Dr. Taylor requested a hearing on December 11, 2003. (1452).

The Hearing Panel was composed of Dr. Don Evans, a general internist, Dr. Bob Winn,* a pathologist, and Dr. Ben Washburn, a cardiac surgeon.  (1953).  The

Hearing Officer was a local attorney, Mike Cole. (1953).  From December 11, 2003 to April 5, 2004, Dr. Taylor's attorneys communicated with the attorneys for the Hospital and Mr. Cole about the Panel Hearing, arguing, for example, that Dr. Taylor's past behavioral problems should not be admissible. (3805-3809, 3810-16). Witness lists were exchanged. (3810-16).  Prior to the hearing, the Hospital told Dr. Taylor of the reasons for the MEC's termination recommendation, the panel members of the Hearing Panel, and his right to object to any one of the panel members. (3814-16).  Dr. Taylor did not object to the composition of the Hearing Panel. (3814-16; 1953).

The hearing took place over four days from April 5 to April 8, 2004, and Dr. Taylor was represented by counsel, who called, examined, and cross-examined witnesses. (1949-2768).  Both sides offered exhibits.  The hospital offered four. Exhibit 1 consisted of four volumes of notebooks (1-522; 523-1153; 1154-1450; 1451-1947), and the tracking report of Dr. Taylor's past behavioral problems (3644-3668); exhibit 2 documented Dr. Taylor's past behavioral problems (3669-3701); exhibit 3 was the minutes of the Endovascular Committee on October 30, 2001 (3702-3704); and exhibit 4 was a chart explaining privileges prepared by Dr. Chappell (3705). (1956-59).  Dr. Taylor offered ten exhibits. (3705A-3790; 2769-3183).

Dr. Taylor introduces no material evidence to suggest that the Hospital's efforts to obtain the facts before suspending and terminating his staff privileges were not reasonable.  In fact, in his Declaration he states that he was denied privileges to perform diagnostic arteriograms, and that he had not done that procedure before 2002 and 2003 (the year he was granted privileges to perform that procedure) (*Id.* at 10 - 11).  He admits that he did not have hospital privileges to use a carotid stent, but defends his actions as a "secondary use," not the "primary procedure" (*id*. at p. 7, ¶ 23) or "primary use."  (*Id.* at p. 9, ¶ 28).  His assertion about the "secondary" versus "primary" use is belied by his Declaration's statement that, in his response to the Endovascular Committee, he provided a September 7, 2003, letter and, "[i]n this letter, I acknowledged that I was not separately credentialed to place a carotid stent as a *primary* procedure, and that was the reason I had spoken to [Chief Medical Officer and Defendant] Chappell immediately after the procedure."  (*Id*. at p. 7, ¶ 22) (emphasis in original).  Dr. Taylor's **conduct then** is at odds with his **words now**: if he was authorized to perform the carotid stent, there was no need to say anything about it to anybody, yet he reported it to the Hospital's Chief Medical Office.  As to the stenting itself, for which he lacked "primary" privileges, Dr. Taylor says the procedure was "unplanned and was employed on an emergent basis and was part of the procedure of carotid endarterectomy."  (*Id*. at p. 9, ¶ 30).

Returning to the Eleventh Circuit's review of a similar situation, the Court also says:

> there is no question that the board decided to terminate [Bryan] "in the reasonable belief that the action was warranted by the facts known." 42 U.S.C. § 11112(a)(4). Again, the record reveals that the board certainly had a factual basis for its action. Bryan concedes that the incidents that led to his termination actually occurred; his only argument is that they did not justify the severe sanction he received. HCQIA clearly grants broad discretion to hospital boards with regard to staff privileges decisions. Accordingly, as in all procedural due process cases, the role of federal courts "on review of such actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges." Shahawy v. Harrison, 875 F.2d 1529, 1533 (11th Cir.1989). No reasonable jury could conclude that Bryan had demonstrated, by a preponderance of the evidence, that the Hospital board did not act in the "reasonable belief that the [termination] was warranted by the facts known after reasonable effort to obtain facts" as required by section 11112(a)(4). 42 U.S.C. § 11112(a)(4).
>
> IV.
>
> In this case, a disciplined physician attempted to have a jury revisit the adverse decision of his medical colleagues. This is precisely the type of case that Congress targeted when passing HCQIA: "[T]he intent of [the HCQIA] was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise." Mahmoodian v. United Hosp. Ctr., Inc., 185 W.Va. 59, 404 S.E.2d 750, 756, *cert. denied*, 502 U.S. 863, 112 S.Ct. 185, 116 L.Ed.2d 146 (1991).

*Bryan*, 33 F.3d at 1336 - 1337.

This court, like the Eleventh Circuit in *Bryan*, concludes no reasonable jury could find the Defendants' actions were such as to strip them of the HCQIA immunity provided by 42 U.S.C. § 11112(a).

A reading of Dr. Taylor's Declarations (#'s 56-4, 56-5) leads the court to conclude that, **whatever** the motives of the individual defendants, Dr. Taylor acknowledges, as he must, that there was a **lot** of "process" involved in his suspensions and termination.  The court's review of the motion submissions, drawing all inferences in Dr. Taylor's favor, suggests that this lawsuit is an over-the-top example of the old maxim, "[n]o good deed goes unpunished."  Dr. Taylor complains that the peer review bodies did not make a reasonable effort to obtain the facts of this case because, "if other physicians would have placed the carotid stent and performed the arteriograms at issue, no adverse action would have followed."  (Pl. Response to Motion for Summary Judgment, p. 77).  The court finds this argument, as it does many of Dr. Taylor's other assertions and arguments, conclusory and unsupported by the record and, accordingly, without merit.  Plaintiffs' argument on this point does not speak to the issue of whether an adequate effort was made to obtain the facts in this case, specifically in light of Dr. Taylor's repeated admissions on the record that he performed the aforementioned procedures that he was not privileged to perform.

Dr. Taylor also argues that there was not a reasonable effort to obtain the facts in this case in that he was unaware that the peer review bodies would consider past "behavioral" issues in their deliberations.  The record in this case clearly establishes that Dr. Taylor was on notice that investigations had been conducted into his

35

"behavioral" problems.   In each instance, Dr. Taylor was confronted about the complaints, made statements, and both the Hospital and Dr. Taylor took certain actions with regard to those complaints.   In no instance is there evidence before the court that Dr. Taylor contested the factual basis of any complaint regarding a "behavioral" issue.   Dr. Taylor has not cited to and this court is unaware of any evidence in support of his contention that reasonable efforts were not made to obtain the facts of complaints regarding "behavioral" problems; thus, Dr. Taylor's argument on this point fails.

Third, Dr. Taylor's staff privileges were revoked only "after adequate notice and hearing procedures [were] afforded to the physician involved or after such other procedures as [were] fair to the physician under the circumstances." § 11112(a)(3). As noted above, § 11112(b) sets forth the "safe harbor" conditions that a health care entity must meet regarding adequate notice and hearing. Section 11112(b) provides as follows:

> A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):
>
> (1) Notice of proposed action
>
> The physician has been given notice stating-

(A)(i) that a professional review action has been proposed to be taken against the physician,

(ii) reasons for the proposed action,

(B)(i) that the physician has the right to request a hearing on the proposed action,

(ii) any time limit (of not less than 30 days) within which to request such a hearing, and

(C) a summary of the rights in the hearing under paragraph (3).

(2) Notice of hearing

If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating-

(A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

(B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3) Conduct of hearing and notice

If a hearing is requested on a timely basis under paragraph (1)(B)-

(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)-

(i) before an arbitrator mutually acceptable to the physician and the health care entity,

(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

37

(iii) before a panel of individuals who are appointed by the entity and are not in direct competition with the physician involved;

(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

(C) in the hearing the physician has the right-

(i) to representation by an attorney or other person of the physician's choice,

(ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

(iii) to call, examine, and cross-examine witnesses,

(iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

(v) to submit a written statement at the close of the hearing; and

(D) upon completion of the hearing, the physician involved has the right-

(i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and

(ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.

42 U.S.C. § 11112(b).

Dr. Taylor argues, at ¶¶ 376 - 378 of his Amended Opposition, pp. 79 - 82, that the Hospital failed to give him notice or an opportunity to be heard on past behavioral

38

events.  The record is that he had them before the October 28, 2003, MEC meeting.

(2662).  And section 11112(b) specifically provides that the failure of a review body

to meet the enumerated conditions does not, *per se*, constitute a failure to meet the

standards of section 11112(a)(3).  Rather, "[i]f other procedures are followed, but are

not precisely of the character spelled out in [section 11112(b)], the test of 'adequacy'

may still be met under other prevailing law."  *Bryan*, 33 F. 3d at 1336, *citing*

H.R.Rep. No. 903, at 10, reprinted in 1986 U.S.C.C.A.N. at 6393.  Moreover, Dr.

Taylor made no contemporaneous objections to the manner in which the hearing

procedures were conducted; section 11112(b) explicitly provides that compliance

with its terms is not required if the physician voluntarily waives them.  Dr. Taylor's

failure to object was a waiver of this argument.

Further, even if no waiver could be found, Dr. Taylor was no stranger to the

Hospital's disciplinary system.  He had been involved in numerous incidents where

his behavior was at issue.  On the record of this case, the court again concludes that

no reasonable jury could conclude that the Hospital had not afforded Dr. Taylor

adequate process under the Act.  Dr. Taylor, or his counsel, may not have had the

notice they would have desired but, in the overall scheme of events, the court is

satisfied that Dr. Taylor was on notice that his past behavioral issues were part of his

history and that, to the extent that such past behavior or issues related to the

performance, present or future, of unprivileged procedures, the Hospital was not required to delineate each such incident or how it might affect the proceedings. Dr. Taylor had a history at the Hospital. The court is not saying that Dr. Taylor alone created that history, only that he was aware of it and that it would be unreasonable for him to accept the "informal" assurance of Dr. Brown that his past behavior was not something about which Dr. Taylor needed to be concerned. Plaintiffs' Amended Opposition, ¶ 102.

Finally, there is no question that the Board decided to terminate Dr. Taylor "in the reasonable belief that the action was warranted by the facts known." 42 U.S.C. § 11112(a)(4). Again, the record reveals that the Board certainly had a factual basis for its action. Dr. Taylor concedes that the incidents that led to his termination actually occurred. HCQIA clearly grants broad discretion to hospital boards with regard to staff privileges decisions. Accordingly, as previously in *Bryan*, *supra,* "as in all procedural due process cases, the role of federal courts 'on review of such actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges.'" 33 F.3d at 1337, citing *Shahawy v. Harrison*, 875 F.2d 1529, 1533 (11th Cir.1989). And again, here, as in *Bryan*, no reasonable jury could conclude that Dr. Taylor's evidence demonstrates, by a preponderance of the evidence, that the Hospital

40

Board did not act in the "reasonable belief that the [suspension and termination] was warranted by the facts known after reasonable effort to obtain facts" as required by 42 U.S.C. § 11112(a)(4).

Given that there is not a genuine dispute as to a *material* fact and that all of the section 11112(a) standards are satisfied in this case, the court concludes that the Hospital is entitled to the immunity from damages liability granted by HCQIA in § 11111(a).[13]  On the substantially developed record in this case, Dr. Taylor could not recover any monetary damages.  As HCQIA provides immunity from monetary damages to the Hospital as well as to those who participated in the peer review process, Plaintiffs' claims for monetary damages (**Counts 6, 8, 9, 10, 11, 12, 13, 14, 18,**[14] **and 19)** are due to be dismissed against all Defendants.  See 42 U.S.C. § 11111(a).

## B.    Qualified Immunity

In Count 1, Dr. Taylor asserts claims based on 42 U.S.C. § 1983 against the Hospital and the ten (10) physician defendants.  To the extent that the Plaintiffs assert

---

[13] The court notes that Plaintiffs cite to a number of immaterial facts in opposition to the instant motion.  While material facts are construed in Plaintiffs' favor, because substantive law determines which facts are material, this court has disregarded any disputed immaterial facts with regard to the HCQIA analysis herein.  *See Chapman*, *supra*, 229 F.3d at 1023.

[14] Count 18, Mrs. Taylor's loss of consortium claim, is alternatively dismissed for the reasons discussed on pp. 4-5, *supra*.

claims against the ten physician defendants acting in their official capacity, such claims are subsumed within their claims against the Hospital.  To the extent that the Plaintiffs assert claims against the ten physician defendants acting in their individual capacity, the Defendants have asserted that the ten physician defendants are entitled to qualified immunity.

"The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Cotton v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks and citations omitted).  "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." *Id.* at 1357-58.  *See also Denson v. U.S.*, --- F.3d ----, 2009 WL 2031036 (7/15/09) (11 Cir.): Qualified immunity is a doctrine that generally shields "[g]overnment officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Anderson v. Creighton*, 483 U.S. 635, 638-39, 107 S.Ct. 3034, 3038-39, 97 L.Ed.2d 523 (1987); *Wood v. Kesler*, 323 F.3d 872, 877 (11th Cir.2003). Thus, a government official is

shielded from liability in two scenarios: (1) the claimant fails to establish that the official violated her rights; or (2) the claimant establishes a violation of rights that are not "clearly established." *See Pearson v. Callahan*, --- U.S. ----, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

July 15, 2009

This is a two-part test. Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Next, the defendant must prove that he or she was "executing that job-related function." *Id.* at 1267. "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cotton*, 326 F.3d at 1358.

The Supreme Court has, until recently, required a two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under the *Saucier* test, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).

If, under the plaintiff's allegations, the defendants would have violated a

43

constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Cotton*, 326 F.3d at 1358 (*quoting Saucier v. Katz*, 533 U.S. 194, 201 (2001). The "clearly established" requirement is designed to assure that officers have fair notice of the conduct which is proscribed. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz,* 533 U.S. 194, 206 (2001). The "unlawfulness must be apparent" under preexisting law. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

This rigid framework was recently made non-mandatory by the Supreme Court in *Pearson v. Callahan*, 129 S. Ct. 808 (2009), in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." Thus, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's recent modification of *Saucier's* analytical process, the substantive analysis remains unchanged; a government official is entitled to qualified immunity protection as long as he "could have believed" his conduct was lawful. *Hunter v. Bryan*, 502 U.S. 224, 227 (1991). To deny immunity, Taylor must

44

affirmatively demonstrate that "no reasonable competent [official] would have" acted as the defendants did.  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Despite the Court's new-found discretion in applying the *Saucier* framework, it nevertheless believes that the traditional two-step approach is appropriate in the instant case. Thus, the Court first addresses whether a constitutional violation exists, before turning to whether either of the defendants are entitled to qualified immunity.

## V.  Due Process Claims

### A.    Procedural Due Process Claims Under the United States Constitution

> 1.    *McKinney v. Pate* does not require dismissal of all of Dr. Taylor's claims.

Defendants first argue that the Eleventh Circuit's decision in *McKinney v. Pate*, 20 F.3d 1550 (1994) (*en banc*) and similar cases require the dismissal of all of Dr. Taylor's procedural due process claims because Dr. Taylor has no due process claims based on his suspension or termination.  McKinney was a former employee of Osceola County, Florida, who was terminated from his position as a building official due to poor performance.  *Id.* at 1554-1555.  The County Board of Commissioners held hearings and ultimately upheld the charges listed in the notice of dismissal provided to McKinney.  *Id.* at 1555.  Believing that he was terminated because of an improper political bias, McKinney filed his claim in federal court, alleging a

45

substantive due process violation under Section 1983. *Id.*  A jury trial was held on this claim and the plaintiff prevailed, but the district court entered judgment as a matter of law on behalf of the defendants.  *Id.*

The Eleventh Circuit initially recognized that the procedural component of the due process clause controlled and not the substantive component.  *Id.* at 1561.  The Court then turned to McKinney's allegation that his termination hearings were biased and that he therefore did not receive the process he was due.  *Id.* at 1562.  The Court recognized that "[a] demonstration that the decisionmaker was biased . . . is not tantamount to a demonstration that there has been a denial of procedural due process [, since] procedural due process violations do not become complete unless and until the state refuses to provide due process."  *Id.* at 1562 (internal quotations and citations omitted).  The court further noted that "in the case of an employment termination case, 'due process' does not require the state to provide an impartial decision maker at the pre-termination hearing.  The state is obligated only to make available the 'means by which [the employee] can receive redress for the deprivations.'"  *Id.*

The court then noted that, under *Parratt v. Taylor*, 451 U.S. 527 (1981), and *Hudson v. Palmer*, 468 U.S. 517 (1984), due process does not require pre-deprivation hearings where holding a hearing would be impracticable and that, in those situations,

46

due process only requires a means of redress for property deprivations.  *Id.* at 1563.

In light of these cases, the court concluded:

> The precedent established by *Parratt* is unambiguous: even if McKinney suffered a procedural *deprivation* at the hands of a biased Board at his termination hearing, he has not suffered a *violation* of his procedural due process rights unless and until the [state] refuses to make available a means to remedy the deprivation.  As any bias on the part of the Board was not sanctioned by the state and was the product of the intentional acts of the commissioners, under *Parratt*, only the state's refusal to provide a means to correct any error resulting from the bias would engender a procedural due process violation.

*Id.* (emphasis in original).

The court then noted that McKinney had "failed to take advantage of any state remedies" and it therefore addressed the issue whether any available state remedies were adequate.  *Id.*  In making this determination, the court first found that a Florida court, through a writ of *certiorari*, could remedy the alleged deprivations–it could order a new hearing.  *Id.*  Next, the court noted that the scope of the Florida Court's review power encompassed McKinney's Section 1983 claim.  *Id.*  Finally, the court noted that the state law remedy was adequate, since the Florida courts "possess the power to remedy McKinney's loss both in terms of damages and equitable relief." *Id.* at 1564.  Thus, the court concluded that "McKinney's state remedy was capable of providing McKinney with all the relief warranted.  Even if McKinney's bias allegations are true, the presence of a satisfactory state remedy mandates that we find

47

no procedural due process violation occurred." *Id.*

Later decisions clarify that *McKinney* does not impose an exhaustion requirement upon Section 1983 plaintiffs. For instance, in *Cotton v. Jackson*, 216 F.3d 1328 (11th Cir. 2000) (*per curiam*), the Eleventh Circuit specified that the directive in *McKinney* "is not an exhaustion requirement. Instead, this directive is a recognition that procedural due process violations do not even exist <u>unless no adequate state remedies are available</u>." *Id.* at 1331 n.2 (emphasis added). The *McKinney* court did not conclude its analysis when it found that other state law remedies existed; it only reached its decision after a finding that those available remedies were <u>adequate</u>.

*Cotton* involved the termination of a university faculty member for alleged sexual harassment. *Id.* at 1329-1330. Soon after his termination, Cotton filed suit against the university and its president. *Id.* The court followed the rubric set forth in *McKinney*, noting that "[i]f adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process." *Id.* at 1332. Ultimately, the court concluded that because "the writ of mandamus would be available under state law to [Cotton], and because we believe that mandamus would be an adequate remedy to ensure that [Cotton] was not deprived of his due process rights, we conclude that

48

[Cotton] has failed to show that inadequate state remedies were available to him to remedy any alleged procedural deprivations." *Id*. at 1333 (internal citations omitted). Thus, as in *McKinney*, the court in *Cotton* also looked to the adequacy of the available remedy before concluding that there was no due process violation.

The Eleventh Circuit further clarified *McKinney* in *Horton v. Bd. of County Com'rs of Flagler County*, 202 F.3d 1297 (11th Cir. 2000). Therein, the court explained:

> [O]ur *McKinney* opinion, and more importantly, its reasoning and holding establish that exhaustion and ripeness are not the doctrines in play, and that the completeness of the procedural due process violation is decided by looking at existing state remedial law.  If the rule of *McKinney* were otherwise, we would have had to hold that McKinney's claim should have been dismissed as unripe. We would have had to do that because McKinney himself had never presented his federal due process claim in state court.  But we did not tell McKinney his federal claim was unripe and dismiss it without prejudice to his pursuing that claim in state court. Instead, we told him that he lost. We told McKinney that he did not have a viable federal due process claim, and we told him the reason he did not is that Florida law provided an adequate remedy for the type of procedural deprivation McKinney claimed to have suffered, even though he had not taken advantage of that state remedy.

*Id.* at 1301.  Thus, the Court in *Horton* clarified that *McKinney* does not require exhaustion of state remedies, but if <u>adequate</u> state remedies exist, then there is no due process violation.  *Accord*, *Foxy Lady, Inc. v. City of Atlanta, Georgia*, 347 F.3d 1232, 1239 (11th Cir. 2003) ("Accordingly, we conclude that sufficient state process

exists to correct any alleged deficiency in the City's liquor license revocation process afforded under § 30-27. Because an <u>adequate</u> post-deprivation process is in place under state law, no federal procedural due process claim exists.") (emphasis added); *Johnson v. Atlanta Independent School System*, 137 Fed. Appx. 311, 315 (11th Cir. 2005) ("Where the state has <u>adequate</u> remedies to cure due process deprivations, that a plaintiff has not taken advantage of, a plaintiff may not pursue his claim in federal court . . . . Upon review of the record and upon consideration of the parties' briefs, we find no reversible error. [Plaintiff] was offered a hearing and declined attendance before his termination. Thus, the district court properly granted summary judgment on this claim.") (emphasis added); *see also Maples v. Martin*, 858 F.2d 1546, 1551-1552 (11th Cir. 1988) (noting in a pre-*McKinney* case involving Auburn University faculty members who were transferred that because they "failed to avail themselves of [the grievance] procedure and presented <u>no evidence that resort to it would have been futile</u> . . . [the employees] have not demonstrated that they were deprived of a constitutionally protected property interest.") (emphasis added); *Lewis v. Hillsborough Transit Auth.*, 726 F.2d 664, 667 (11th Cir. 1983) (*per curiam*) (finding in a pre-*McKinney* case no procedural due process violation when the plaintiff admitted that a "grievance procedure, if utilized, could eliminate a constitutional violation," thereby implicating that the available state law remedy was adequate).

Plaintiffs' response to the argument that Dr. Taylor has not asserted valid claims for

the violation of constitutional rights or federal statutes is inextricably rooted in the

mistaken premise that Defendants "improperly suspended and terminated Dr. Taylor."

(Pl. Response to Motion for Summary Judgment, p. 87).

    2.  <u>The Pre-Termination Due Process Standard</u>

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) is the leading case

on the issue of pre-termination due process.  Prior to *Loudermill*, *Stewart v. Bailey*,

556 F.2d 281 (5th Cir. 1977) was the leading precedent in the Eleventh Circuit on the

issue.[15]  *See also Nicholson v. Gant*, 816 F.2d 591, 598 (11th Cir. 1987) (the pre-

termination opportunity to respond must be meaningful).

> *Loudermill* instructs that:
>
> The essential requirements of due process ... are notice and an
> opportunity to respond. The opportunity to present reasons, either in
> person or in writing, why proposed action should not be taken is a
> fundamental due process requirement.... The tenured public employee
> is entitled to oral or written notice of the charges against him, an
> explanation of the employer's evidence, and an opportunity to present
> his side of the story.

470 U.S. 532, 546.

    It is beyond dispute that Dr. Taylor received notice and an opportunity to

---

[15]  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit).

respond.  The hearing(s) were exhaustive, filling large notebooks with exhibits and testimony.  Dr. Taylor was ably represented by counsel throughout.  While not phrased this way, Dr. Taylor's strongest, or best, objections to the manner in which he was suspended and ultimately terminated are not (procedural) due process objections.  Rather, it is the type of evidence that was used (*e.g.*, his psychiatric records, his wife's psychiatric records) and the manner in which some of that evidence was obtained, *e.g.*, the psychiatric records through the use of a release Dr. Taylor says was altered to include information he never agreed to release.

3.  Post-Termination Denial of Due Process

Dr. Taylor confronted and cross-examined his accusers in a hearing that stretched over four (4) days, generating notebooks full of exhibits and testimony.  The right to confront and cross examine remains fundamental to post-deprivation due process.  *See*, *Kelley v. Smith*, 764 F.2d 1412 (11th Cir. 1985), *Adams v. Sewell*, 946 F.2d 757 (11th Cir. 1991).  Both *Kelley* and *Adams* were reversed on other grounds in *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994); nothing in *McKinney* abrogates either the *Kelley* or *Adams* due process holding.  *McKinney* overruled all prior decisions, including *Kelley* and *Adams*, to the extent that they "granted pretextually terminated employees section 1983 causes of action premised on substantive due process violations." (*McKinney*, 20 F.3d 1550, 1560).  Thus, *Kelley* and *Adams* are

still good law in this circuit for the proposition that an employee must receive, as a matter of procedural, as opposed to substantive, due process during a post-termination hearing, the opportunity to confront and cross-examine his accusers. *Chambers v. Thompson*, 150 F.3d 1324, 1326 (11th Cir. 1998) ("We are bound to follow a prior panel or en banc holding, except where that holding has been overruled or undermined to the point of abrogation by a subsequent en banc or Supreme Court decision."). Dr. Taylor was given notice of the core charge against him, performance of two surgeries for which he lacked privileges to perform. Other matters came up, and were the law controlling this action different, Dr. Taylor's claims regarding his psychiatric records might stand on more solid ground. That is not the test, however. Dr. Taylor had an extended hearing, and a review of that hearing by a decision maker who could have refused to accept the termination recommendation.

Similarly, accepting as true for purposes of this Motion Dr. Taylor's complaints about the make-up of the various committees ("stacked" with individuals who disliked him) or the appellate "rubber-stamping" of the committee's decision to terminate him, those complaints do not make out violations of his due process rights.

Dr. Taylor's defense to his suspension and termination, set forth in his Amended Opposition to the Motion for Summary Judgment, was that either what he did was part of his core privileges or the procedures were justified as emergent:

53

221.   Dr. Taylor communicated to the committee his belief that the performance of intraoperative arteriograms was part of the carotid endarterectomy procedure and that his privilege to perform such arteriograms was incorporated in his core vascular surgery privileges and was consistent with the Medical Staff's prior actions to grant him further privileges to perform diagnostic arteriograms based on performance of intraoperative arteriograms. (ST 9)

222.   Dr. Taylor also defended his use of the carotid stent in the care of this patient at the October 13, 2003 meeting, as such use represented an appropriate management of a medical emergency that arose during the endarterectomy.  (HH 001940-41; ST 9)

**_Dr. Taylor Did Have Privileges to Perform Procedures on Emergent Basis_**

223.   Although Dr. Taylor did not have privileges to place a carotid stent as a primary procedure, his placement of the stent in this case was secondary to the carotid endarterectomy procedure.  (ST 9)

224.   Privileges for the use of carotid stenting as a primary procedure at the Hospital are available only through the Investigative Review Committee's ("IRC") study; the protocol for the IRC governing carotid stents addresses the use of carotid stenting as the primary planned procedure for areas that are not accessible to carotid endarterectomy.   (HH 2026)

225.   Dr. Taylor's use of the stent was technically for an area not appropriately accessible by carotid endarterectomy but would not fall within the IRC protocol because the use of the stent in this case was as an adjuvant technique to the procedure of carotid endarterectomy and not a primary treatment of carotid disease with a stent.  (HH 2157; ST 9; _see_ ¶ 53, _supra_)

226.   The stent was placed on an emergent basis as allowed by the Hospital's Medical Staff Bylaws. (HH 54, 2184-85, 3194)

Amended Opposition at 36-37 (emphasis in original).

There is an extended administrative record regarding Dr. Taylor's suspension and termination.  Applying the summary judgment standards articulated above, the court concludes that, whatever else may be said about Dr. Taylor's suspension and particularly his termination, it cannot be said that he did not have ample opportunities to present his side of the story, or that the process was summary.  Dr. Taylor's peer review process was lengthy, involved many doctors and hospital executive staff, numerous meetings, and hearings.  Defendants say the procedures were exhaustive, and the court finds that assertion supported in the record beyond hope of contradiction.  (1618; 1581; 1590; 1938; 1461-62; 1938-39; 3803; 3933-34; 3935).  Dr. Taylor vigorously attacks the motives and personal feelings of various members of the committees. Even assuming the truth of those assertions, they do not overcome the massive amounts of undisputed evidence that Dr. Taylor undertook surgical procedures that he lacked privileges to perform, and that he did so knowingly.  Thus, any animosity toward Dr. Taylor allegedly held by some or all of the members of the various committees or reviewing authority is insufficient to overcome the Defendants' evidentiary showing.  The fact that some or all of the individuals involved, whether sued or not, may not have liked Dr. Taylor, or even actively disliked him, would be give more weight if the suspension and termination process had been summary; it wasn't.  Such animosity would carry more weight if Dr. Taylor

55

made a better showing than he has regarding whether or not he was privileged to

perform the surgical procedures in question; he hasn't.  As noted earlier, the court

cannot allow the finder of fact, under the guise of due process review, or review

under the HCQIA, place itself into the middle of the debate between Dr. Taylor and

the defendants as to whether Dr. Taylor's actions were privileged.  The excerpts from

his Amended Opposition quoted above would be, standing alone, sufficient to support

the finding that Dr. Taylor has not met his evidentiary burden to overcome the

Defendants' showing that they are entitled to summary judgment as detailed herein.

Dr. Taylor as much concedes that, technically, he was on shaky ground at best.  The

following facts are drawn from his Amended Opposition.

> 207.   On September 7, 2003, Dr. Taylor provided a response to
> the Endovascular Committee.  (HH 1619-20)

> 208.   In this letter, he acknowledged that he was not separately
> credentialed to place a carotid stent as a *primary* procedure, and that was
> the reason that he had spoken to Chappell immediately after the
> procedure.  (HH 1619)

Additionally, in his September 7, 2003, response, Dr. Taylor also said "the Surgery

CDRC is entirely correct in finding that I did a procedure that I'm not credentialed

to do."  (HH1619).  In short, the Defendants have met their evidentiary burden, and

Dr. Taylor has not overcome it.

Further, and in the alternative, in light of the above facts the court concludes

that Dr. Taylor's own admissions justified his suspension and termination.

## VI.  Other State Law Claims
Invasion of Privacy (Count 11), Breach of Physician & Therapist
Privilege (Count 13), and Outrage (Count 14)

In the above counts, the Plaintiffs assert claims that the court construes as arising from what they claim was the alteration of a Release Dr. Taylor executed concerning information from the Menninger Clinic.[16]  Dr. Taylor offers two (2) different versions of the Menninger Authorization for release of information.  (ST 0107, ST 0108).  The latter (second release) is a very legible document, the former (first release) hardly so.  That said, the difference appears to be that in ST 0107, the boxes "Summary of Treatment" and "Further treatment" are not checked, whereas in ST 0108, the boxes "Summary of Treatment" and "Further treatment" are checked. Dr. Taylor concedes authorizing Menninger's release of information (to Dr. Chappell) concerning "Background History" and "Complete professional assessment". (Amended Opposition ¶¶ 279 - 281).[17]

Dr. Taylor was admitted to the Menninger Clinic on April 9, 2001, and

---

[16]  The court assumes reader familiarity with Dr. Karl Menninger and the center that bears his name.

[17]  Dr. Taylor asserts he executed the Menninger release "under duress."  The court concludes that, under the existing circumstances, Dr. Taylor may well have been pressured into entering the Menninger Clinic and executing the Menninger release, but that he has failed to establish "duress" as to either.

discharged on May 1, 2001.  His treating physician was James J. Stockard, MD, PhD.

Some of the Menninger Clinic records appear twice in the record.  (HH 001533 - 001538; HH01540 -01545).

Without delving into the specifics, a Menninger record that arguably falls outside of the scope of the "first" release would be a "Progress Note," 001539, which did not deal directly with Dr. Taylor, nor did it deal with any of Dr. Taylor's issues as identified by (treating physician) Dr. James Stockard in his initial assessment, 001533 - 001538.  The 001539 issue can also arguably be said to appear again in Dr. Stockard's Discharge Summary (00154 - 001560), as well as in a (Menninger) Assessment record (001561 - 001567).

Drawing all inferences in Dr. Taylor's favor, a finder of fact could decide that someone, and not by mistake or accident, altered Dr. Taylor's Menninger release of information form.  Further, the court cannot say as a matter of law that the Hospital, or its agent(s), would have obtained the information identified in the previous paragraph, the 001539 data, using only the first, more limited, release (ST0107).

1.  Outrage - Assuming the worst, that someone acting on behalf of the Hospital intentionally altered Dr. Taylor's Menninger release of information consent after Dr. Taylor had executed that release, the outrage claim still cannot survive.  Outrage claims are limited by Alabama law to the following: employment

relationships (usually involving sexual propositions and inappropriate physical contact, *e.g.*, *Cunningham v. Dabbs*, 703 So.2d 979 (Ala. Civ. App. 1997); *Brewer v. Petroleum Suppliers, Inc.*, 946 F.Supp. 926 (N.D. Ala. 1996); handling of workmen's compensation claims, such as when the conduct crosses the line between a mere failure to pay a claim and intent to cause severe emotional distress, *e.g.*, *Gibson v. Fidelity Casualty Co.*, 454 So.2d 526 (Ala. 1984) and insurance claims, *e.g.*, *Nat. Sec. Fire & Cas. Co. v. Bowen*, 447 So.2d 133 (Ala. 1983); and claims involving bodies or burial, *e.g.*, *Whitt v. Julsey*, 519 So.2d 901 (Ala. 1987). Dr. Taylor's facts fit none of these categories, and do not rise to the requisite level to sustain an outrage claim.

2. <u>Violation of Physician and Therapist Privilege</u> - The court is unaware of any Alabama case upholding a claim of outrage for the violation of the physician - patient privilege or the therapist - patient privilege. *See* 5 U.S.C. § 552a) (a), the Privacy Act, which is applicable to federal agencies that improperly release adverse information about an individual; *see also Fanin v. U.S. Dept. of Veterans Affairs*, 572 F.3d 868 (11th Cir. 2009). As to any constitutional claims arising hereunder, *Whalen v. Roe*, 423 U.S. 1313, 1315 (1975) forecloses such claims under the facts here.

3. <u>Invasion of Privacy</u> - For the reasons stated in 2., the court finds there is no actionable tort under federal statutory or constitutional law for the improper

obtaining or release of the Menninger information described above.

The same cannot be said for the Alabama tort of Invasion of Privacy.  Dr. Taylor and Mrs. Taylor have made out a *prima facie* claim of a type of invasion of privacy under Alabama law that makes actionable a "wrongful intrusion into one's private activities in such a manner as to outrage or to cause mental suffering, shame or humiliation to a person of ordinary sensibilities."  *Smith v. Doss*, 251 Ala. 250, 253, 27 So. 2d 118, 120 (1948); *see also Martin v. Norfolk S. Ry.*, 926 F.Supp. 1044 (N.D. Ala. 1996) (*id*.).

The privacy claim here would be an intrusion claim, *see* APJI 35.00(4).[18]  The inquiry is two-fold.  First the focus is on whether the means employed to obtain the information were offensive, or objectionable, or unreasonable; altering a medical release would satisfy this requirement.  The second factor is the defendant's purpose in obtaining the information.  *Hogin v. Cottingham*, 533 So.2d 525 (Ala. 1988).  If a jury were to find, as the Plaintiffs claim, that the Hospital obtained the information described above in an effort to bolster its case for Dr. Taylor's suspension and termination, that would satisfy the second inquiry.

The foregoing notwithstanding, however, Dr. Taylor and Mrs. Taylor's

---

[18]  The court assumes, without deciding, that while there was "publication" here, the publication was limited to the suspension and termination proceedings.

60

Invasion of Privacy claim cannot survive summary judgment.  As relief for their injuries resulting from this claim, Plaintiffs request only monetary damages.  For the reasons discussed at length *supra*, a monetary damages award against Defendants is barred by HCQIA immunity.  Accordingly, even though Plaintiffs state a *prima facie* case of Invasion of Privacy, Defendants are nevertheless entitled to summary judgment as to that claim.

## VII.  Summary And Relief

For the reasons given, the Defendants' Motion for Partial Summary Judgment is due to be **GRANTED** as to all remaining counts and as to all Defendants.  A separate Order will be entered consistent with this Memorandum Opinion.

**DONE** this 30th day of November, 2009.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

61